United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   VALENTINA A ROMBALCH,              No C 04-01701 VRW

12              Plaintiff,

13                                            ORDER

14        v

15   JO ANNE B BARNHART, Commissioner
     of Social Security

16              Defendant.

17   _____

18        Plaintiff Valentina A Rombalch[1] appeals from a decision

19   of the Social Security Administration (SSA) denying her application

20   for Social Security Income (SSI) benefits under Title XVI of the

21   Social Security Act ("the Act").  The parties have filed cross

22   motions for summary judgment.  Pl Mot (Doc # 6); Def Mot (Doc #10).

23   Based upon careful review of the administrative record and the

24   applicable law, the court DENIES plaintiff's motion and GRANTS

25   defendant's motion.

26   _____

27        [1] Although the complaint and all other filings in the instant appeal
     spell plaintiff's last name "Rombalch," nearly all documents in the
28   administrative record spell her name "Rombakh."  Where record documents are
     quoted in this order, the original spelling will be used.

**United States District Court**

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**I**

**A**

Plaintiff was born in Russia on June 23, 1948, and was fifty-four years old on November 12, 2002, the date of application for benefits at issue on this appeal.  Administrative Record (AR) (Doc #5) at 96 146-55.  She completed her education in Russia, including high school and four years of college studying "lathe production technology and glassworks technology," then worked in Russia for twenty-nine years as an instructor at a technical school AR 17, 34-35, 129, 243.

On October 17, 1997, plaintiff was admitted to the United States, together with her husband, as a refugee under section 207 of the Immigration and Nationality Act, 8 USC § 1157, AR 99, apparently because her husband is Jewish.  AR 235.  According to plaintiff, she has never held employment in any capacity in the United States.  AR 39.  In her November 13, 2002 SSI application, plaintiff stated that her household in Santa Clara consisted of herself, her husband and her two sons and that the house was owned or in the process of being bought by one of her sons, Oleg Rombakh.  AR 100.  At the December 2003 hearing, however, plaintiff testified that she lived only with her husband, whom she described as a "very sick person."  AR 49-50.  In her daily activities questionnaire, plaintiff wrote that on an average day she studied English, cooked, cleaned, read the newspaper and books, walked and rested.  AR 123.

Evidence regarding the exertional requirements of plaintiff's job in Russia appears in various places in the administrative record.  In plaintiff's December 28, 2002, Work History Report (WHR), she described her teaching job in Russia as a

United States District Court

For the Northern District of California

"turner instructor," AR 161, and represented that her job responsibilities included:  writing "reports for each lesson," conducting lessons in which she taught students how to operate "turner machines" and overseeing students as they worked.  AR 35-36, 161.  She described the job as requiring four hours per day walking, three hours per day standing and one hour per day sitting, frequent lifting of fifteen pounds and occasional lifting of at most twenty pounds.  AR 161, 129-30.  Her statements in a March 22, 2001 WHR filed in connection with her first SSI claim were generally consistent, but noted frequent lifting of ten, not fifteen, pounds.  AR 129-30.  In later testimony, however, plaintiff described the job as requiring much more exertion; specifically, that it required her to lift almost thirty pounds and to spend the majority of her day on her feet.  AR 44.

On March 6, 2001, plaintiff applied for SSI benefits contending a disability onset date of January 1, 1979.[2] Plaintiff's husband applied for SSI benefits at the same time.  AR 115.  AR 103-12.  Her application was denied initially and on reconsideration, and she did not request a hearing on the 2001 claim.  AR 16.

On November 13, 2002, plaintiff applied for SSI benefits for a second time, AR 99-102, claiming to be disabled based on various health conditions including "high blood pressure,

_____

[2] The administrative law judge's decision incorrectly stated that plaintiff's first application gave a disability onset date of January 1, 1993.  AR 16.  It is possible that the ALJ confused this application with that submitted on the same date by plaintiff's husband, Gennadiy Nisunovich Rombakh, that was also included in the record, apparently by mistake. See AR 93-95.  The discrepancy is not material to any issue before the court on this appeal.

**United States District Court**

For the Northern District of California

arthritis, vericose veins [sic], bleeding uterus; depression" which
made her get tired easily, feel weak and suffer from headaches.  AR
103-12.  This time, she alleged an onset date of December 1, 1996.
AR 99.  Plaintiff's application was again denied initially and on
reconsideration.  AR 78, 82, 83.  Plaintiff requested a hearing
before an ALJ, AR 87, and secured appointed counsel to represent
her.  AR 90.  Because the administrative law judge (ALJ) declined
to re-open plaintiff's earlier claim, AR 16, and plaintiff did not
appeal that aspect of the ALJ's ruling, only the November 2002
application is the subject of this appeal.  The administrative
record, however, contains nearly all the documents and medical
records pertaining to both the 2001 and the 2002 applications.

**B**

Apart from the medical reports ordered by the SSA in
connection with plaintiff's claim for benefits, discussed below,
medical records in the administrative record consist of extensive
clinic notes from plaintiff's treating physician at the Santa Clara
Valley Medical Center's Refugee Clinic.  AR 270-329; 351-85.
Noteworthy from these records was an August 23, 2001 visit with Dr
Susan Wong in which plaintiff brought up depression:  "Never feels
suicidal.  But once she feels angry enough she wants to bite
herself.  Pt doesn't want to be referred to mental health.  She
just wants to try meds."  AR 272.  Dr Wong prescribed Zoloft, an
antidepressant, id, and refilled this prescription at least twice,
AR 270, 372.  Plaintiff presumably took Zoloft until February 4,
2002, when Dr Wong noted "pt felt a lot better.  She wants to stop
taking zoloft after finish her current Rx."  AR 370.  On September

United States District Court

For the Northern District of California

1    4, 2002, however, plaintiff asked to restart Zoloft because "she

2    sort of feels 'down' again lately." AR 362.  The notes reflect at

3    least two refills of Zoloft after that date.  AR 399, 406.

4          Regarding the evaluation of plaintiff's asserted physical

5    impairments, the record contains reports from two agency-ordered

6    comprehensive internal medicine examinations and attendant internal

7    agency medical evaluations by non-examining physicians.

8          On May 31, 2001 plaintiff saw Paul D Levin, MD for a

9    comprehensive internal medicine evaluation.  AR 222-25.  Dr Levin's

10   report made note of plaintiff's reported medical history, including

11   past chest wall pain, high blood pressure, headaches with eye

12   twitches, arthritis pain in her hands and knees, post-bunionectomy

13   pain in both feet and unexplained pain in her left hip, AR 222.  He

14   noted her height to be 63 inches and her weight to be 259 pounds;

15   he described her as "very overweight."  AR 223.  Dr Levin noted the

16   range of motion in plaintiff's spine and hips to be "normal."  AR

17   224.  He diagnosed plaintiff with high blood pressure "under fair

18   control," "mild to moderate" osteoarthritis of the hands, mild

19   osteoarthritis of the knees, and "probably degenerative disc

20   disease of her lumbar spine, significant."  AR 225.  Dr Levin also

21   diagnosed "chronic mild discomfort" in her feet due to previous

22   surgery for bunions.  AR 222, 225.  Dr Levin suspected plaintiff

23   had active disc disease because of the "absence of a left ankle

24   jerk" and radiating pain down her leg.  AR 225.  He concluded that

25   she could lift ten pounds easily, twenty pounds occasionally, walk

26   for a total of thirty minutes in an eight-hour day, sit for eight

27   hours in an eight-hour day, bend, stoop and crouch, and had no

28   limitation in fine or gross touch, reaching, handling, grasping or

manipulating; he stated that she should avoid crawling, climbing, balancing or reaching.  Id.  In his report, he found that she was able to stand for ten to fifteen minutes at a time.  Id.

Following receipt of Dr Levin's report, agency physician Harmon Michelson, MD reviewed the case records and completed a Physical Residual Functional Capacity Assessment dated July 2, 2001.  AR 226-32.  His primary diagnosis was morbid obesity, with a secondary diagnosis of hypertension.  AR 226.  He checked boxes showing plaintiff able to lift twenty pounds occasionally and ten pounds frequently, stand/walk six hours per day and sit six hours per day, with unlimited pushing/pulling (upper extremity) capacity.  AR 227.  He found her stooping, kneeling, crouching, crawling and climbing abilities limited because "claimant is morbidly obese and would not be able to get in and out of these postures except on an occasional basis, slowly, and with considerable exertion."  AR 228.  He found no manipulative, visual, communicative or environmental limitations.  AR 229-30.  He found plaintiff's alleged onset date of 1979 "not credible" given her stated work history through 1997 and "activities enumerated to psychologist by claimant herself which include up to full days of attendance at school" and expressed skepticism about plaintiff's claim of disability:

> claimant's credibility is tainted by symptom
> amplification, at the very least.  Note
> especially, that except for the [consulting
> examiner], no one spontaneously observes any
> impairments at all.  Note that her gait and
> ability to get around in various * * * offices is
> unimpaired.  There is no justification for further
> x-rays or [work-up] at department's expense,
> because no matter what they show, the longitudinal
> MEOR and the current function speak for
> themselves, and the claimant is not even near
> allowance level impairment.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

AR 231.  Dr Michelson's evaluation expressed disagreement with Dr Levin's suggested restrictions, commenting that they "are backed up by neither his own exam nor the longitudinal HX.  Just about all the findings are normal."  AR 232.  These conclusions were reviewed and affirmed by Samuel McFadden, MD.  AR 233.

On February 20, 2003, in connection with plaintiff's March 2002 application for benefits, Dr Dean Chiang, a board-certified internal medicine specialist, conducted a second physical examination of plaintiff.  AR 332-35.  He noted her height as 64 inches and her weight as 256 pounds and described her as an "alert, oriented, obese white female who was friendly and cooperative."  AR 333.  Regarding plaintiff's "chief complaint" of joint pain, he concluded that she suffered from joint pain that was "likely secondary to osteoarthritis," but found her "freely ambulatory at least with short distances inside the clinic," but stated it would not be surprising to find out "her mobility is somewhat limited for long distances."  AR 335.

Dr Chiang determined that plaintiff could stand and walk for between four to six hours in an eight-hour day and would be able to lift and carry, as well as push and pull, thirty pounds occasionally and ten to fifteen pounds frequently.  Id.  Dr Chiang found "no manipulative limitations and no other relevant workplace environmental limitations."  Id.

Following submission of Dr Chiang's report, agency physician Neyvin Gordon, MD completed a further RFC Assessment on April 1, 2003 that agreed in all significant respects with that completed in July 2001 (AR 226-32).  AR 341-48.

\\

United States District Court

For the Northern District of California

Plaintiff also underwent three agency-ordered mental health examinations in connection with her applications for SSI benefits; these formed the basis for agency physicians' assessments of her claim.

On June 7, 2001, psychiatrist Rafael H Gutierrez, MD examined plaintiff without the help of an interpreter.  His report noted "I need to say that this lady spoke very little English and had a hard time communicating with me in which I tried my very best throughout the interview to understand her. * * * [T]his was en extremely difficult case for me since there was not a translator provided * * *. [T]here needs to be a psychiatric evaluation at the county medical clinic with a translator."  AR 234-35, 237.  With those caveats, he diagnosed plaintiff with dysthymic disorder with adjustment disorder, "depressed mode," and a Global Assessment of Functioning (GAF) of 55.  Id at 237.  The report mentioned plaintiff's obesity and her tearfulness several times and observed "I feel that this lady is depressed." AR 236.  But Dr Gutierrez also found her oriented and cooperative with "good contact with reality."  Id at 236.

On August 13, 2001, a consultative neuropsychologist, Faith Tobias, PhD, evaluated plaintiff with the assistance of a translator.  AR 242-45.  Dr Tobias gave a simple Axis I diagnosis of "major depressive disorder" and deferred Axis II and III diagnoses.  AR 244.  Of eleven work-related abilities listed in her report, Dr Tobias found no impairment in nine of the areas including following simple instructions, following complex/detailed instructions, maintaining pace or persistence to perform both simple and complex tasks, maintaining adequate

United States District Court

For the Northern District of California

attention/concentration and adapting to changes in job routine.  AR 245.  Dr Tobias found that plaintiff displayed "marked impairment" in the ability to "[w]ithstand the stress of a routine work day" as well as the ability to "[m]aintain emotional stability [and] predictability."  Id.  She also noted that "[d]uring today's evaluation the claimant was able to read and write simple sentences in English.  However, her spoken English is more limited."

On September 15, 2001, agency physician George Norbeck, MD completed a Psychiatric Review Technique form indicating that plaintiff suffered from affective disorders that were "severe," but "not expected to last twelve months."  AR 251.  The review indicated no restriction in activities of daily living, social functioning or maintaining concentration, persistence or pace, and indicated "insufficient evidence" regarding repeated episodes of decompensation.  AR 261.  On September 15, 2001, agency physician Craig A Smith MD affirmed these findings.  AR 251.  Dr Norbeck also completed a Mental Residual Functional Capacity Assessment dated September 14, 2001 that identified "moderate" limitations in working in proximity to others without distraction and "marked" limitations in "the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  AR 248.

On March 5, 2003, plaintiff saw consultative psychologist Ubaldo Sanchez, PhD, for a comprehensive evaluation.  AR 336-40.  Dr Sanchez's report did not mention an interpreter.  It noted further that plaintiff "speaks English with an accent" and "did not have any difficulty with complex instructions and repetition and

United States District Court

For the Northern District of California

emphasis were not needed."  AR 336.  It also noted that plaintiff "did not demonstrate any physical impairment, and no distinguishing motor characteristics were noted" and, regarding plaintiff's report of "feeling depressed," it quoted plaintiff as saying the medicine for depression prescribed by her doctor had made her feel "much better."  It also noted "She does not see a mental health professional.  'It's a Russian thing.  We never go to a psychologist.'"  AR 338.

Dr Sanchez conducted several tests:  the Bender Visual Motor Gestalt Test, Reyes 15 Items Memory Test, Wechsler Adult Intelligence Scale - III and Wechsler Memory Scale - III. Plaintiff obtained a full-scale IQ score of 80, placing her at the "lower limits of the low average range of measured intelligence." AR 338.  The report noted, however, that "[h]er verbal scores [from her measured intelligence tests] must be viewed with caution given the cultural bias of the test."  AR 340.  On the memory sub-tests, plaintiff scored in the lowest one percentile in auditory, immediate and working memory, and in the lowest fifth percentile in visual memory, indicating "a decline in memory skills."  Id.  Dr Sanchez diagnosed plaintiff with major depressive disorder and a GAF of 53.  AR 339.  He listed "unemployed" among "psycho-social stressors."  Id.  Dr Sanchez concluded that plaintiff would benefit from mental health treatment and that she "is not limited to daily activities such as dressing, bathing and eating, * * * would not have any difficulty being socially appropriate, * * * [is] able to perform mildly complex tasks [and] * * * to handle funds," but would have "mild to moderate difficulty concentrating, focusing and keeping up with the pace of a working environment."  AR 340.

10

United States District Court

For the Northern District of California

On the basis of Dr Sanchez's report, agency physician Craig A Smith, MD completed a Psychiatric Review Technique form in April 2003 marking only the boxes for "affective disorders" and "impairments not severe."  AR 387.  On June 23, 2003, agency physician George P Norbeck, MD affirmed this conclusion.  Id.

C

On April 11, 2003, the SSA denied plaintiff's second application for SSI benefits.  AR 78.  After her request for reconsideration proved fruitless, AR 83, plaintiff requested a hearing before an ALJ.  AR 87.  She also secured counsel to represent her.  AR 90.  On October 30, 2003, plaintiff's attorney, Mr Terry LaPorte, sent a letter to the ALJ amending plaintiff's alleged disability onset date to the date of her initial application ——— March 6, 2001.  AR 176.  In this letter, plaintiff requested the reopening of her March 6, 2001 application pursuant to the provisions of 20 CFR § 1588-89.  Id.

The ALJ opened the hearing on December 18, 2003.  AR 33-63.  Plaintiff, her attorney and Vocational Expert (VE) Ron Morrell were present.  Plaintiff testified that she was disabled due to "strong pain" in her hands, leg, and back, and that she had problems with her knee and hip and with depression.  AR 40-48.  While at the hearing, plaintiff wore a brace on her left wrist.  AR 20, 54.  When the ALJ asked her about it, plaintiff testified that three months before the hearing her doctor had recommended the brace to ease the "strong pain" she suffered in her left wrist.  AR 54-55.  Plaintiff stated that she could stand for about ten to fifteen minutes at a time and that she could not walk further than

11

**United States District Court**

For the Northern District of California

across the street without taking a break to rest.  AR 43.
Plaintiff further testified that she began taking classes to learn
English in 1997, and that for the three years preceding her 2003
hearing, she attended English classes three days a week for about
three hours,  AR 38, and that her progress in learning English was
hindered by her medical impairments, especially by her memory
problems.  AR 49.

        The VE testified that based on the exhibit file,
plaintiff's past job in Russia fell into the light exertional
category, but that plaintiff's inconsistent testimony at the
hearing that her job had required lifting as much as thirty pounds
suggested a medium exertional level.  AR 58.  The VE opined that
there would be "no transferable skills to sedentary employment
[but] [t]here would be transferable skills to light exertionally."
AR 59.  Plaintiff's attorney then questioned the VE about various
hypothetical non-exertional (i e, mental health) restrictions drawn
from various mental health evaluations in the reports, such as
"mild to moderate difficulties in concentrating, focusing and
keeping up with the pace of a working environment," "marked
restriction in the ability to withstand the stress of a routine
workday" and "marked restriction in the ability to maintain
emotional stability * * * caused by depression."  AR 60-62.  The VE
testified that with only "mild" non-exertional restrictions,
plaintiff could transfer her skills to other light work, but that
"moderate" restrictions would hamper her ability to maintain
employment.  AR 60-62.

        On February 14, 2003, the ALJ issued a decision finding
that plaintiff did not meet the criteria for disability.  The ALJ

began by denying the request to re-open plaintiff's 2001 application, stating that, because more than one year had elapsed following the initial determination of the prior claim, "that claim does not require reopening for 'any reason,'" AR 16, and no good cause to reopen the prior determination existed.  Id.

To determine whether plaintiff was entitled to benefits, the ALJ conducted the five-step sequential evaluation of plaintiff's claim of disability as set forth at 20 CFR § 404.1520(b)-(f), which considered:  (1) whether plaintiff was currently engaged in "substantial gainful activity"; (2) whether plaintiff had a "severe" impairment or combination of impairments; (3) if plaintiff had a severe impairment, whether plaintiff had a condition which met or equaled the conditions outlined in the Listing of Impairments, 20 CFR Pt 404, Subpt P, App 1 as well as the duration requirement; (4) if plaintiff did not have such a condition, whether plaintiff was capable of performing her past work; and if not, (5) whether plaintiff had the residual functional capacity to perform any other work which existed in substantial numbers in the national economy.

At the first step, the ALJ found that the claimant had not engaged in substantial gainful activity since the amended alleged onset of disability.  AR 21.

At the second step, he found that plaintiff had two medically determinable impairments —— a mild adjustment disorder and mild arthritis —— and that these qualified as "severe."  AR 21. Concerning plaintiff's reported depression, the ALJ adopted the specific findings of consultative psychologist Dr Sanchez that plaintiff "would not have significant limitations in her activities

13

United States District Court

For the Northern District of California

of daily living or social functioning, and would have only 'mild to moderate' limitations in her ability to maintain concentration and keep up with the pace of a working environment."  AR 19.  "Because there is no evidence that the claimant ever felt the necessity to pursue psychiatric or psychological care of any kind, and because this medical opinion is significantly more restrictive than others in the file," the ALJ accorded less weight to the opinion of Dr Tobias who opined, in 2001, that plaintiff "would have 'marked' limitations in withstanding the stress of a routine workday and in maintaining emotional stability and predictability."  Id.

At step three, the ALJ found that while the medical evidence supported a finding that plaintiff had mild arthritis, this impairment did not singly or in combination with plaintiff's non-exertional limitations, "meet or medically equal * * * one of the impairments listed in Appendix 1, Subpart P Regulations [No] 4."  AR 18, 22.  Because there was no evidence that plaintiff received or was then receiving any more than basic medical treatment, the ALJ based his conclusions on the consultative evaluations and state agency physicians who had previously reviewed the complete, objective medical evidence.  AR 19.  Regarding the asserted mental health restrictions, the ALJ wrote:

> Neither consultative mental health evaluator in the record opined that the claimant would be incapable of returning to her past relevant work due to her alleged mental health impairments.  In fact, as emphasized previously, the claimant has pursued no mental health treatment or even referrals, other than those required by the State Agency, secondary to her SSI claims.

AR 20.  The ALJ rejected Dr Tobias's opinion that plaintiff would have "marked" limitations in managing work stress and emotional

14

United States District Court

For the Northern District of California

stability as "inconsistent with the medical records" and with the opinions of the other evaluators and because plaintiff had not pursued mental health treatment.  Id.

The ALJ also discounted plaintiff's subjective complaints as "not fully credible when compared to the record as whole," noting specifically plaintiff's admitted capacity to spend her days cooking, cleaning, studying English and "helping out around the house," the uncontradicted evidence that her depression was effectively controlled with Zoloft and her failure to pursue mental health treatment.  AR 22.  The ALJ commented on the conflicting dates alleged for onset of disability, including one that alleged severe pain and depression during a period when she also claimed to be involved in an intensive English study program.  AR 20.

At step four, the ALJ concluded that "the claimant's past relevant work as a sheet metal instructor did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 416.965)," and that her "medically determinable mild adjustment disorder and mild arthritis [did] not prevent [her] from performing her past relevant work."  AR 22.  This conclusion was based on the ALJ's finding, based on the reports in the record, that plaintiff could lift and carry up to twenty pounds occasionally and ten pounds frequently, sit up to six hours and stand and walk for up to six hours in an eight-hour workday.  Id.  Accordingly, he found that she could "perform a significant range of light work."  AR 18, 22.  Here, the ALJ also noted that, according to the VE, claimant could return to her past relevant work as a sheet metal instructor "as it is customarily performed in the United States general economy."  AR 21.  Having

**United States District Court**

For the Northern District of California

reached this conclusion at step four, the ALJ did not proceed to step five.

In conclusion, the ALJ held that the claimant was "not under a 'disability' as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 416.920(e))" and was therefore ineligible for SSI payments under Sections 1602 and 1614(a)(3)(A) of the Act.  AR 22.

Plaintiff appealed to the SSA's Appeals Council, which denied review, rendering the ALJ's decision final.  AR 7-11.  On April 30, 2004, plaintiff timely filed the instant action seeking judicial review.


                                  II

Under 42 USC § 405(g), a decision to deny benefits may be overturned if the decision is not supported by substantial evidence or if the decision is based on legal error.  <u>Thomas v Barnhart</u>, 278 F3d 947, 954 (9th Cir 2002).  Substantial evidence means more than a scintilla but less than a preponderance.  Id.  Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion.  Id.  Where the evidence is susceptible to more than one interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld.  Id.


                                 III

                                  A

"Disabled" is defined as "unable to do any substantial gainful activity by reason of any medically determinable physical

16

United States District Court

For the Northern District of California

or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 CFR § 416.927.

Conditions meeting the criteria set forth in the "Listing of Impairments" are presumed disabling, without any specific finding as to the claimant's ability to perform his past relevant work or any other jobs.  Lester v Chater, 81 F3d 821, 828 (9th Cir 1995); 20 CFR § 416.920(d).  A claimant is deemed disabled if her condition either "meets" or "equals" a listed impairment.  Id.  To "meet" any of the listed mental impairments, the SSA must find that diagnostic criteria in paragraph A of the impairment definition (for example emotional lability and impairment in impulse control or medically documented persistence of a short term memory impairment) are met, as well as that a specified number of functional restrictions in paragraph B (for example, marked restriction of activities of daily living and marked difficulties in maintaining concentration, persistence or pace) are met.  Id.  The purpose of the functional criteria in paragraph B is to measure the severity of the claimant's impairment.  20 CFR Part 404, subpart P, App 1 § 12.00(C).

Even if a claimant's mental impairment does not meet the criteria specified in the listings, however, she must be found disabled if "the combination of [her] impairments is medically equal to any listed impairment."  Lester, 81 F3d at 829; 20 CFR § 416.926(a).  As relevant here, the claimant's illnesses "must be considered in combination and must not be fragmentized in evaluating their effects."  Lester, 81 F3d at 829, citing Beecher v Heckler, 756 F2d 693, 694-95 (9th Cir 1985).  In addition, where a

United States District Court

For the Northern District of California

claimant alleges mental impairments, the ALJ is required to use the "special technique" set forth in 20 CFR § 416.920a(a) for evaluating the severity of mental impairments.

The court may set aside the ALJ's final decision when that decision is based on legal error or where the findings of fact are not supported by substantial evidence in the record taken as a whole.  <u>Tackett v Apfel</u>, 180 F3d 1094, 1097-98 (9th Cir 1999). Even if substantial evidence supports the ALJ's factual findings, the decision must be set aside if improper legal standards were applied in weighing the evidence and reaching the decision.  See <u>Benitez v Califano</u>, 573 F2d 653, 655 (9th Cir 1978).


                                  B

In her appeal, plaintiff alleges that she is disabled and unable to work due to osteoarthritis and a history of major depression.  AR 407.  Plaintiff makes two challenges to the decision:  (1) she asserts that he failed to consider her exertional and non-exertional limitations in combination and (2) she contends that he improperly failed to account for plaintiff's lack of facility in English.  Pl Mot (Doc #6) at 5.

                                  1

First, the court addresses plaintiff's assertion that the ALJ improperly failed to consider the combination of plaintiff's exertional and non-exertional limitations.  The ALJ found that plaintiff "has a mild adjustment disorder and mild arthritis, impairments that are 'severe' within the meaning of the Regulations but not 'severe' enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1,

18

United States District Court

For the Northern District of California

1    Subpart P, Regulations No 4."   AR 18.

2          The ALJ properly relied on Dr Chiang's report finding

3    plaintiff free of significant physical limitations as on the

4    unequivocal conclusions of agency physicians that plaintiff was not

5    disabled by her arthritis.

6          Similarly, the three SSA-ordered mental health

7    evaluations were reviewed and considered by the state agency

8    physicians who concluded that plaintiff was able to perform light

9    work.  AR 391.  The ALJ, relying on these reports, addressed the

10   degree of limitation in each of the four functional areas specified

11   in § 404.1520a.  AR 19-20.  The ALJ gave cogent reasons for

12   according less weight to Dr Tobias's more restrictive findings,

13   which he found to be at odds with the other medical evidence and

14   with plaintiff's failure to seek treatment.   Id.

15         Plaintiff also contends that the ALJ should not have

16   discredited her alleged mental impairments based on her failure to

17   pursue mental health treatment given the asserted scarcity of

18   mental health services for primarily Russian-speaking individuals

19   without health insurance in the Santa Clara County area.  AR 408.

20   It was reasonable, however, for the ALJ to give weight to the fact

21   that "the claimant has pursued no mental health treatment or even

22   referrals, other than those required by the State Agency, secondary

23   to her SSI claims," AR 20, and that plaintiff's depression had

24   been so completely controlled by Zoloft that she discontinued this

25   medication for six months.  AR 21.

26         The ALJ's finding that plaintiff's impairments did not,

27   in combination, meet or equal a listed impairment is supported by

28   substantial evidence in the record and must therefore be upheld.

2

Plaintiff's second claim — that the ALJ improperly failed at step four of the sequential analysis to consider plaintiff's inability to speak English in evaluating her ability to perform her past relevant work — is also without merit.  Plaintiff contends that her inability to communicate in English made her unable to perform her past relevant work and therefore amounts to a disability.  Id at 6.

The governing section of the Act is 42 USC § 1382c(a)(3)(B), which provides:

> an individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

In Social Security Ruling 82-40, the SSA set forth guidance as to how to approach the fourth step to determine "whether the individual can do his or her previous work, whether in the United States or in a foreign economy," when the prior work experience is in a foreign economy:

> The relevance of past work in a foreign economy for purposes of regulations sections 404.1520(e) and 416.920(e) is no different from the relevance of past work in the United States economy with respect to the physical and mental demands of the particular past job.  If a claimant can meet the sitting, standing, walking, lifting, manipulative, intellectual, emotional and other physical and mental requirements of a past job, he or she is still functionally capable of performing that job regardless of the fact that the individual no longer resides in the country where the past work was performed. It is only after a claimant proves

1
2
3
4

> that he or she is not able to do his or her
> previous work that the burden shifts to the
> Secretary to show that there is work available in
> the United States national economy which the
> claimant can do (the fifth and last step of the
> sequential evaluation process).

5   The stated purpose of SSR 82-40 was to address problems arising from

6   the view that "past work performed in a foreign economy" was only

7   relevant to the fourth step if substantially similar work was found

8   in the United States economy by making clear that vocational factors

9   such as education, should not be considered at the fourth step of

10  the sequential analysis.  See 20 CFR §§ 404.1560(b), 416.960(b).

11  Instead, whether similar work can be found in the United States

12  economy is an inquiry properly reserved for the fifth step of the

13  sequential analysis.

14        The Ninth Circuit has specifically upheld SSR 82-40 as

15  consistent with the Social Security Act and its implementing

16  regulation(s).  Quang Van Han v Bowen, 882 F2d 1453, 1457 (9th Cir

17  1989).  In Quang, a claimant whose occupational history consisted

18  solely of working in an herbal medicine store in Vietnam challenged

19  SSR 82-40 as inconsistent with 42 USC § 1382c(a)(3)(B), which

20  defines "disability" in part as the inability to "engage in any

21  other kind of substantial gainful work which exists in the national

22  economy."  The court held that the Secretary's interpretation of §

23  1382c(a)(3)(B) —— that "although the Act requires 'other' work to

24  exist in the United States, it places no such limitation on

25  'previous' work" —— was one of at least two reasonable

26  interpretations of the statute and not inconsistent with the Act or

27  its implementing regulations.  Id at 1457.  The court explained the

28  justification for SSR 82-40 thusly:

United States District Court

For the Northern District of California

1
2
3
4
5

> Each of the steps asks the ultimate question, whether
> the claimant is healthy enough to be employable, in
> terms that approximate the statute with increasing
> precision.  If the claimant is in sufficient physical
> and mental condition to perform [her] previous work,
> [her] impairment is clearly not so severe as to
> preclude employment.  This should hold true no matter
> where [her] previous work took place * * *.

6  Id.

7       While Quang did not directly address plaintiff's central

8  contention in this appeal ⸺ the ability to speak English as a

9  factor in determining disability ⸺ its holding, when combined with

10  other relevant sources of law, plainly bars consideration of a

11  claimant's inability to communicate in English when evaluating

12  claimant's ability to perform previous relevant work.  In Garcia v

13  Secretary of Health & Human Servs, 46 F3d 552 (6th Cir 1995), the

14  Sixth Circuit rejected a claimant's challenge to the SSA's

15  determination that he retained the RFC to perform his past relevant

16  work despite his "virtual inability to communicate in English."

17  The court analyzed the text of the statute and found that Congress

18  intended to exclude vocational factors from step four of the

19  sequential analysis:

20
21
22
23
24
25
26

> This intent is borne out by the structure of the
> disability definition.  The phrase "considering his
> age, education, and work experience" interrupts and
> therefore exclusively modifies the phrase "but cannot
> * * * engage in any other kind of substantial gainful
> work which exists in the national economy."
> Accordingly, the phrase "considering his age,
> education, and work experience" does not modify the
> phrase "not only unable to do his previous work."
> The inevitable reading is that Congress intended a
> claimant's ability to perform previous work to be
> assessed apart from the considerations of age,
> education, and work experience."

27  Id at 555-56 (citations omitted).  In Garcia, the Sixth Circuit

28  expressed accord with the Ninth Circuit's opinion in Quang,

United States District Court

For the Northern District of California

explaining that "Congress manifested the intention [to distinguish sharply between unemployment compensation and the disability benefits provided by the Act] by defining 'disability' under the Act as a predominantly medical determination, as opposed to a vocational one." Id at 558-59.  Accord <u>Bussi v Barnhart</u>, 87 Soc Sec Rep Serv 605, 2003 US Dist LEXIS 9278 at *20, 2003 WL 21283448 (SDNY 2003) (claimant's inability to speak English held irrelevant to determination of whether she can perform her past relevant work); <u>Martinez v Bowen</u>, 685 F Supp 70, 71 (SDNY 1988) (remand for consideration of impact of plaintiff's inability to speak English on his ability to perform past relevant work held inappropriate, citing Social Security Ruling 82-40).

        The ability to communicate in English is considered as part of the rule governing education as a vocational factor, 20 CFR § 416.964(b)(5).  The regulation acknowledges that the inability to speak English is a handicap:

> Because English is the dominant language of the country, it may be difficult for someone who doesn't speak and understand English to do a job, regardless of the amount of education the person may have in another language.  Therefore, we consider a person's ability to communicate in English when we evaluate what work, if any, he or she can do.

Id.  If, however, the SSA determines at step four that the claimant can still perform her past relevant work, "we will find that you are not disabled," and will not proceed to step five, at which vocational factors are considered.  20 CFR § 416.920(a)(4)(iv). If, and only if, the ALJ had reached the fifth step under the sequential analysis would it have been appropriate to evaluate educational factors such as plaintiff's ability to speak English, but his analysis concluded at step four.

1        The ALJ's mention that plaintiff was able to perform her
2    past relevant work as it is "customarily performed in the United
3    States general economy," AR 21, while helpful, was not necessary to
4    find plaintiff not disabled at step four.

5

6                                    IV

7        For the reasons stated herein, plaintiff's motion is
8    DENIED and defendant's motion is GRANTED.  The clerk shall enter
9    judgment in favor of defendant and against plaintiff.

10       The clerk is directed to terminate all pending motions
11   and to close the file.

12

13       IT IS SO ORDERED.

14

15                         _____

16                         VAUGHN R WALKER
                           United States District Chief Judge
17

18

**United States District Court**
For the Northern District of California